Tranter *v.* Allegheny County Authority et al.

Argued May 23, 1934. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Clarence B. Nixon,* and *John B. Gordon,* for plaintiff.

*E. J. Dimock* and *Ralph H. Frank,* with them *Chas. C. Fowler, J. P. Fife,* and *Hawkins, Delafield & Longfellow,* for defendants.

OPINION BY MR. JUSTICE LINN, June 13, 1934:

Original jurisdiction was taken in this case on the joint petition of plaintiff and defendants stating that

the questions at issue were of such unusual public importance as to justify an earlier hearing and decision than could be obtained if the proceedings were begun in the common pleas; that, for want of immediate hearing, contemplated benefits of great value would "probably [be] altogether prevented and lost."

The plaintiff, a taxpayer, filed a class bill to enjoin Allegheny County Authority, a public corporation, and Dowler, Reed and Trees, members of the corporation, from proceeding pursuant to the provisions of the Act of December 27, 1933, Special Session, 1933-1934, P. L. 114, under which the Allegheny County Authority was incorporated. Defendants filed a joint answer. On their separate intervention petitions, Allegheny County, the City of McKeesport and the City of Pittsburgh were made parties defendant. The case was heard on bill, answer and replication. Relief is asked on the ground that the statute is repugnant to the Constitution of Pennsylvania, and that a certain provision in the contract proposed to be executed by the corporation and the United States is in conflict with the General County Law.

The title of the act is "An Act providing for the creation of public 'Authorities' in counties of the second class; authorizing such 'Authorities' to enter into agreements with the Government of the United States, particularly as they relate to the National Industrial Recovery Act and any amendment and supplements thereto, the Commonwealth of Pennsylvania and political subdivisions and municipalities thereof, and with others; defining and providing for the organization and dissolution of such 'Authorities'; conferring certain rights, powers, duties and immunities upon them and their officers and members; prescribing the conditions upon which such 'Authorities' may exercise their powers; endowing such 'Authorities' with the right of eminent domain, and with the power to finance projects by the issuance and sale of bonds; authorizing such 'Authorities' to make and receive appropriations; repealing cer-

tain acts and parts of acts inconsistent herewith; and for other purposes."

Section 1, article I, provides "That in each county of the second class of this Commonwealth, there is hereby created a body corporate and politic to be known as the 'Authority' of said county (hereafter in this act called the 'Authority'); provided, however, that such 'Authority' shall not become operative nor transact any business until and unless the board of county commissioners of the county in which it is created shall, by proper resolution, declare its creation, and appoint and designate the members thereof, as in this act herein prescribed. Such 'Authority' shall constitute a public body corporate and politic of said county for the public purposes herein set forth and shall exercise an essential governmental function in effectuating such purposes, and, to that end, said 'Authority' shall be endowed with and is hereby granted, the following powers, to wit:

"(a) To construct, maintain and operate bridges, tunnels, streets, highways, traffic distribution centers, traffic circles,......and parts of any of said projects, and improvements thereof and additions thereto, and to charge and collect fees, tolls, rentals and charges in connection with any or all of said structures, projects, additions or improvements, and any or all parts thereof; the proceeds therefrom to be used for the purpose of maintaining and operating the same and of repaying to the United States Government, and to others, any and all monies, and interest thereon, which may have been borrowed therefrom in connection with the purposes for which said 'Authority' was created, as same may be due and payable."

Additional clauses confer other powers.

Article II prescribes what shall be done by the county commissioners to obtain a certificate of incorporation.

Article III, section 301, provides that "The 'Authority' shall consist of three members, all of whom shall be citizens of this Commonwealth and of the county in which said 'Authority' is created and set up, and who

shall be designated and appointed by the county commissioners. All members shall continue to hold office until their respective successors are appointed and qualified."

Article IV confers the right to acquire property.

Article V provides (section 501), inter alia: "Notwithstanding any provisions of this act, the 'Authority' shall have no power to pledge the credit of the Commonwealth of Pennsylvania or the credit of any county, city, borough, township or other municipality of said Commonwealth, or to create any debt of said Commonwealth or of such municipality, county, city, borough or township, and the bonds and debts of said 'Authority' shall be a lien upon and payable solely from the assets and revenues of said 'Authority.' "

Article VI provides (section 601), that "The 'Authority' is hereby authorized to make and enforce such rules and regulations, and to establish, levy and collect (or to authorize, by contract, franchise, lease or otherwise, the establishment, levying and collection of) such tolls, rents, rates, fees and other charges in connection with any properties which it may construct, erect, acquire, own, operate or control as it may deem necessary, proper, desirable and reasonable, which said tolls, rents, rates, fees and other charges shall be at least sufficient to meet the expenses thereof, including the cost of maintenance and operation thereof and interest and sinking fund or amortization charges; and the 'Authority' is hereby authorized and empowered to pledge such tolls, rates, rents, fees and other revenues, or any part thereof, either presently received or to be received in the future, or both, as security for the repayment, with interest and taxes, if any, of any monies borrowed by it or advanced to it for any of its authorized purposes, and as security for the satisfaction of any other obligation assumed by it in connection with such loans or advances."

Article VII provides that "The Commonwealth of Pennsylvania, and all municipalities and political subdivisions thereof, so long as any bonds or other securities

or obligations of the 'Authority' remain outstanding and unpaid, and unless and until adequate provision is made by law for the protection of those advancing money upon obligations, shall not diminish or impair the power of the 'Authority' to own, operate or control its properties and facilities, or to establish, levy and collect tolls, rents, rates, fees and other charges in connection with such properties or facilities."

Article VIII confers exemption from taxation of property held by the Authority and the obligations issued by it.

Article IX declares that "The provisions of this act are severable......"

The bill avers that, pursuant to the statute, the county commissioners of Allegheny County obtained a certificate of incorporation for the authority and named Dowler, Reed and Trees, also defendants, as the members. It sets forth the assessed value of taxable property in the county, the net debt, and that the power to increase the debt of the county, without the consent of the electors, is limited at the present time to an increase of $12,659,851.24. Plaintiff avers that, unless restrained, Allegheny County Authority will execute a certain loan agreement with the United States (a copy of the agreement is made part of the bill), by which, without the consent of the electors, the corporation will issue its 4% bonds in the principal amount of $24,000,000.00[1] and sell them to the United States under the terms of a trust indenture (also made part of the bill), and will expend the proceeds, together with a sum of money, not to exceed $6,000,000.00, to be donated by the United States, in the construction of certain public highways and highway improvements. It is averred that, to carry out the terms of the agreement, it will be necessary that the county commissioners grant and convey to the Allegheny County Authority (power to convey is conferred

---

[1] They mature in increasing amounts in successive years beginning in 1937 and concluding in 1964.

by section 401) "certain of the real property of said County which is already devoted to public use, to wit, in connection with the proposed public work or improvement known as Liberty Tube Plaza," and furnishing means of entrance and exit to and from Liberty Tunnel, a public highway, and that the corporation proposes to enter upon said land and make certain improvements thereon for the purpose of improving and enlarging the use of said highway. It is also averred that the county commissioners intend to grant and convey to defendant corporation certain other property, now devoted to public use in connection with proposed and existing bridges, specified and described in the bill, which bridges are to be replaced with modern and more adequate structures. The bill avers that the municipal authorities of the city of Pittsburgh will grant and convey to the defendant corporation certain rights in and domain and control over certain public highways in the city, for the purpose of widening, and otherwise improving the same, including a wharf from which the city now receives tolls, on the north bank of the Monongahela River between designated termini.

It is specifically charged in the bill that the statute is in conflict with certain provisions of the constitution to be referred to later in this opinion.

The averments of fact in the bill are admitted in the answer, and, in addition, defendants make specific averments concerning the property proposed to be conveyed to the corporation, that the highways and bridges now in use, and included in the project, are "inadequate to serve with safety and convenience the volume of traffic now daily using the same"; that the bridges are inadequate and unsafe and require excessive expenditure for maintenance; that all of the property to be conveyed is part of the system of highways in the city and county and that all require improvement. Defendants also aver that, by the terms of the contract, "after the cost of all of the public works and improvements to be constructed by defendant Authority shall have been fully

paid out of the revenues received by defendant Authority from the same, then all of the property of said City conveyed to defendant Authority will revert to and become the property of the County of Allegheny improved by the public works and improvements constructed thereon by defendant Authority, without cost either to the said City or to the County of Allegheny, and will then and thereafter be dedicated to public use, as well of the residents and taxpayers of the City of Pittsburgh as of the public generally."

The replication admits the facts averred in the answer.

The loan agreement provides that the money received shall be "used by the Borrower for the construction, extension of, additions to, alteration, conversion, repair and improvement of the following described public works and improvements (herein collectively called the 'Project') . . . . . ." Details of the project are specified and comprise twelve separate items which include certain bridges, tunnels, and other highways. In short, a great improvement in the highway system is proposed by the defendant Authority, and this improvement plaintiff seeks to have enjoined for the reasons stated.

The inquiry, then, deals with the highways of the Commonwealth, a subject that is governmental and public in character; by contrast, we may note that those classes of activity which local subdivisions of government conduct in their proprietary or private character, are not involved in our consideration of this record; as to the distinction, see Com. v. Casey, 231 Pa. 170, 174, et seq., 80 A. 78.

"The highways, roads, streets and bridges of the Commonwealth, apart from private ownership such as turnpike companies, are the property of the State; it may set up any agency to administer, control and maintain them." Westmoreland Chemical etc. Co. v. Public Service Commission, 294 Pa. 451, 456, 144 A. 407, 409; see, also, Jamison v. Cumberland County, 48 Pa. Superior Ct. 32, affirmed, 234 Pa. 621; Garr v. Fuls, 286 Pa. 137, 143, 133 A. 150; Blainesburg-West Brownsville Road,

293 Pa. 173, 142 A. 319; Greene Co. v. Center Twp., 305 Pa. 79, 157 A. 777; Com. ex rel. v. Walker, 305 Pa. 31, 156 A. 340. In the exercise of its power over the highways involved in the project, and for the limited purposes necessary to its execution, the State authorized the transfer by the county and the municipalities concerned, of the property, in the control of the State, necessary to execute the project.

Defendants deny that the statute is unconstitutional and that the loan agreement is in conflict with the General County Law. In dealing with the objections to the validity of the statute, it is necessary to keep in mind the rule, stated in Sharpless v. Mayor of Philadelphia, 21 Pa. 147, 164, and frequently repeated since, "that we can declare an Act of Assembly void, only when it violates the constitution *clearly, palpably, plainly;* and in such manner as to leave *no doubt* or hesitation in our minds." In Com. ex rel. v. Reeder, 171 Pa. 505, 513, 33 A. 67, 68, it was said: "whatever the people have not, by their constitution, restrained themselves from doing, they, through their representatives in the legislature, may do. This latter body represents their will just as completely as a constitutional convention, in all matters left open by the written constitution. Certain grants of power, very specifically set forth, were made by the states to the United States, and these cannot be revoked or disregarded by state legislation; then come the specific restraints imposed by our own constitution upon our own legislature; these must be respected; but in that wide domain not included in either of these boundaries the right of the people through the legislature to enact such laws as they choose, is absolute. Of the use the people may make of this unrestrained power, it is not the business of the courts to inquire. We peruse the expressions of their will in the statute; then examine the constitution and ascertain if this instrument says, 'Thou shalt not,' and if we find no inhibition, then the statute is the law simply because it is the will of the people and not because it is wise or unwise."

It will be convenient to deal with these objections in the order in which both briefs present them.

1. It is first said that the statute violates article II, section 1, vesting legislative power in the General Assembly; that, by empowering the county commissioners to take the steps necessary to obtain the charter for Allegheny County Authority, legislative power was delegated. The legislature has made the law permitting organization of the corporation in certain circumstances. No power to make the law was delegated to the county commissioners; all that remained for them to do, was to find a fact from which they should determine whether to act or not, i. e., whether it was desirable to take advantage of the law in accord with its provisions. If they decided in the affirmative, it was then necessary to comply with the statute to bring the corporation into existence. The cases relied on by plaintiff are not inconsistent with this view; their facts are so different from those in this record, as to illustrate clearly why the statute is not repugnant to the section in question. In Pittsburgh's Petition, 138 Pa. 401, 430, 21 A. 757, the statute was condemned because it authorized the city councils to legislate by creating new departments in the city government and to define their powers, matters which we were required to say "the legislature must settle......" In O'Neil v. American Fire Insurance Co., 166 Pa. 72, 30 A. 943, the statute was invalid because it delegated to the insurance commissioner the legislative power of prescribing the terms and conditions which insured and insurers must submit to in order to make a contract of insurance. Plaintiff's contention must be rejected on the principle applied in Locke's Appeal, 72 Pa. 491; Middletown Road, 15 Pa. Superior Ct. 167, 174; Reading v. Savage, 124 Pa. 328, 16 A. 788; Com. v. Woodring, 289 Pa. 437, 137 A. 635; Baldwin Twp. Annexation, 103 Pa. Superior Ct. 106, affirmed 305 Pa. 490, 158 A. 272.

2. Article III, section 7, prohibits "any local or special law: ....... Regulating the affairs of counties, cities,

townships, wards, boroughs or school districts." It is said that, as there is at the moment only one county of the second class, the legislation was intended for that county and is, therefore, local or special. The contention is inconsistent with the constitutional amendment of 1923, now section 34 of article III. It declares that "The legislature shall have power to classify counties, cities, boroughs, school districts and townships according to population and all laws passed relating to each class ......shall be deemed general legislation within the meaning of this Constitution." The provisions of Act No. 30 are general and apply to all counties of the second class as classified by the legislature pursuant to the amendment. It is immaterial that the accident of population placed but one county in the second class for the time being: Sambor v. Hadley, 291 Pa. 395, 406, 140 A. 347. There is no ground for plaintiff's criticism that the statute is a local law because only a limited number of those counties which would be entitled to do so may avail themselves of its application, with the result condemned in Frost v. Cherry, 122 Pa. 417, 15 A. 782. Here the law applies to all the counties in the class, not to such only (assuming there were more than one in the class) as should locally determine whether the act should apply in the county: In re Lehigh Valley Coal Co., 164 Pa. 44, 30 A. 210; Com. v. Woodring, 289 Pa. 437, 137 A. 635.

3. Article III, section 20, provides that "The General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever." Allegheny County Authority is, as section 1 of the statute provides, "a public body corporate and politic of said county for the public purposes herein set forth and shall exercise an essential governmental function." Plaintiff's first objection, under this head, suggests that Allegheny County Authority is either

a special.commission or a private corporation or association, and, therefore, within the prohibition. The objection not only ignores the plain meaning of the words, but also the rule that, in construing ordinary words of the constitution they must be given the popular and general sense in which they were understood by the electors voting for or against its adoption: Keller v. Scranton, 200 Pa. 130, 49 A. 781; Com. ex rel. v. Powell, 256 Pa. 470, 473, 100 A. 964.

By 1873, when the convention was engaged in preparing the constitution, public opinion had recognized the economic mistake of taking from municipalities certain powers and conferring them on independent commissions, while, at the same time, requiring the municipality to pay the bills incurred by the commission without any restraining voice in the expenditure. The separation of the power to incur debts from the duty of providing for their payment by taxation, produced the principal mischief complained of and which it was sought to prevent. Notorious examples were the Public Buildings Commission, created to build the city hall in Philadelphia, Act of August 5, 1870, 1871 P. L. 1548 (Perkins v. Slack, 86 Pa. 270; Perkins v. Phila., 156 Pa. 554, 27 A. 356) ; and the Penn Avenue Commissioners, operating in the City of Pittsburgh, Act of April 2, 1870, P. L. 796 (Mellor v. Pittsburgh, 21 P. L. J. (O. S.) 185). The subject was considered by the convention with particular reference to the experience of these two cities (Debates, volume 2, page 697 et seq.), and that experience illustrates the character of legislative interference with local government that was intended to be prevented. It cannot be said that the creation of a public corporation as a state agency to take over public highways for the limited purpose of improving them, paying for the improvement out of revenues collected for their use, and then returning them to the local political subdivisions to which they had formerly been entrusted by the state, is a special commission, in any sense in which those words were used in the constitution, either in substance

or spirit. And, it need hardly be added that the designed use of the words "private corporation"[2] cannot include " a public body corporate and politic of said county," under the rule that the expression of one thing excludes what is not expressed. Com. v. McAfee, 232 Pa. 36, 44, 81 A. 85. See Wheeler v. Phila., 77 Pa. 338, 345. As public corporations were excluded when corporations were being spoken of, the word association cannot be held to include a public corporation.

Concluding, then, that Allegheny County Authority is not a special commission, private corporation or association, the objection might be dismissed, but it may also be added that the statute authorizes no supervision or interference with municipal improvements, money, property or effects in the sense contemplated by the constitution. Allegheny County Authority, as the agent created for the purpose by the State, deals not with property owned by the municipality, but with the highway system of the Commonwealth as to which, as we have repeatedly held, the power of the state is supreme, and this makes it immaterial that the trustee, under the trust indenture, The Colonial Trust Company of Pittsburgh, may enter for the purpose of collecting tolls or otherwise in the event of default by the Authority. Cf. Blood v. McCarty, 112 Cal. 561, 44 Pac. 1025. Section 501, supra, provides that the defendant cannot pledge the credit of the Commonwealth or of any county, city, borough, township or any other municipality, or create any debt of the county or other municipality, and that its bonds and debts are a lien upon and payable solely from the assets and revenue of the Authority.

---

[2] In this connection, it may be noted that, during one phase of the discussions in the convention, the word "corporation" was not qualified by the word "private," later reinserted by amendment. When the motion to add the word "private" was made, the following appears: "Mr. Harry White: I approve entirely of the suggestion made by the gentleman from Pittsburgh and the word ought to be here, because it was in the section originally." Debates, volume 5, page 292.

It can levy no taxes. Cases like Porter v. Shields, 200 Pa. 241, 49 A. 785 and Moll v. Morrow, 253 Pa. 442, 98 A. 650, on which plaintiff relies, show clearly why defendant is not within the prohibition. On the general subject see Brode v. Phila., 230 Pa. 434, 455, 79 A. 659; Kraus v. Phila., 265 Pa. 425, 436, 109 A. 226; Com. v. Woodring, 289 Pa. 437, 137 A. 635; Junge's Appeal, 89 Pa. Superior Ct. 548, 564; Ward's Appeal, 289 Pa. 458, 465, 137 A. 630; Walnut & Quince Sts. Corp. v. Mills, 303 Pa. 25, 154 A. 29; Clark v. Beamish, 313 Pa. 56, 66, 169 A. 130.

4. Plaintiff contends that the act is not within the proclamation of the governor convening the special session, as required by article III, section 25. Among the subjects mentioned in the proclamation, for consideration by the General Assembly, were the following: "Recovery legislation, including coöperation with the National Recovery Administration and other Federal agencies;......authority to the Governor and other state officers to apply for and meet the conditions necessary to receive Federal grants, advances or loans to the State or for self-liquidating projects;......authority to municipalities to construct public works, to apply for and accept Federal grants and loans and to issue revenue bonds;......establishment of 'Authorities' for the construction of public works......" Under the settled rule, the statute is within the call: Likins's Petition, 223 Pa. 456, 72 A. 858; Com. v. Liveright, 308 Pa. 35, 56 et seq., 161 A. 697.

5. The next reliance is on article IX, section 7, which provides that "The General Assembly shall not authorize any county, city, borough, township or incorporated district to become a stockholder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual." In their brief, counsel for the plaintiff frankly express doubt whether the statute is in conflict with this provision of the constitution. As mere doubt of constitutionality is not

sufficient (Gottschall v. Campbell, 234 Pa. 347, 363, 83 A. 286), the objection might be dismissed without further discussion. Plaintiff suggests that, by giving up, during the period of the trust indenture, the use of free highways and substituting toll highways, the county and the municipalities are appropriating money to the Authority. The suggestion must be rejected. Tolls for the use of a highway are not taxes: Ruler v. York County, 290 Pa. 427, 139 A. 136; nor can they be considered an appropriation of money by the municipality. The constitution contains no prohibition on the exercise by the State of the power to collect the cost of the highway by direct charge to the users. The history and purpose of the section have been so often stated that they need not be again repeated. Defendant corporation has no stockholders; it is not a private corporation, or business association; it is not organized for profit, and is not within the evil intended to be prevented by this section of the constitution. See Wheeler v. Phila., 77 Pa. 338, 355; Brooke v. Phila., 162 Pa. 123, 126, 134, 29 A. 387; Com. v. Walton, 182 Pa. 373, 376, 38 A. 790; Brode v. Phila., 230 Pa. 434, 79 A. 659; Sambor v. Hadley, 291 Pa. 395, 140 A. 347; Downing v. Erie School District, 297 Pa. 474, 479, 147 A. 239; Wentz v. Phila., 301 Pa. 261, 274, 151 A. 883.

6. The next complaint is that the act is repugnant to article IX, section 10, providing "Any county, township, school district or other municipality incurring any indebtedness shall, at or before the time of so doing, provide for the collection of an annual tax sufficient to pay the interest and also the principal thereof within thirty years." Plaintiff contends that the corporation is a municipality. Dillon, Municipal Corporations, 5th edition, section 32, says: "We may, therefore, define a municipal corporation in its historical and strict sense to be the incorporation, by the authority of the government, of the inhabitants of a particular place or district, and authorizing them in their corporate capacity to exercise

subordinate specified powers of legislation and regulation with respect to their local and internal concerns. This power of local government is the distinctive purpose and the distinguishing feature of a municipal corporation proper. The phrase 'municipal corporation' is used with us in general in the strict and proper sense just mentioned; but sometimes it is used in a broader sense that includes also public or quasi corporations, the principal purpose of whose creation is as an instrumentality of the State, and not for the regulation of the local and special affairs of a compact community." See also Philadelphia v. Fox, 64 Pa. 169 at 180; Pittsburgh's Petition, 32 Pa. Superior Ct. 210, 219, affirmed, 217 Pa. 227, 66 A. 348, and sub nom. Hunter v. Pittsburgh, 207 U. S. 161; Shirk v. Lancaster, 313 Pa. 158, 162, 169 A. 557. Plaintiff has suggested no reason for considering defendant a municipality within the terms of the constitutional provisions. The word "municipality" certainly could not have been understood by the voters as including a public corporation like defendant: Keller v. Scranton, supra; Com. ex rel. v. Powell, supra; Long v. Cheltenham Twp. School District, 269 Pa. 472, 475, 112 A. 545.

It cannot be said that the Authority's debt will be the debt of the county. The state authorized the creation of a public corporation which is denied the power to levy taxes or assessments: section 1 (i) and section 1 (r). The power, conferred in section 1 (i), to borrow money and to issue its bonds or other obligations secured by mortgage or trust deed, is necessarily limited by section 501, expressly denying to the corporation the power "to create any debt of said Commonwealth or of such municipality, county, city, borough or township, and [providing that] the bonds and debts of said 'Authority' shall be a lien upon and payable solely from the assets and revenues of said 'Authority.' " As the credit of the county and the municipalities cannot be pledged, the highways and improvements which constitute the project cannot be taken for the debt of the Authority, though

they may be controlled for such limited time and extent as may be necessary to pay the debt out of the revenues received, in accordance with the terms of the trust indenture.

7. Plaintiff contends that, as the statute provides for the appointment of the members of the Authority by the county commissioners, instead of for their election, the statute is invalid under article XIV, section 2, providing: "County officers shall be elected at the municipal elections and shall hold their offices for the term of four years, beginning on the first Monday of January next after their election, and until their successors shall be duly qualified......" The contention is that "since the jurisdiction of the Authority is coextensive with the jurisdiction and territorial limits of the County, and since the Authority has been created to perform purely governmental functions in the County, the members of the Authority are in fact county officers and should be elected rather than appointed." But mere coincidence of boundary or character of duty performed is not sufficient to make them county officers, as has been recognized in analogous instances: The Mayor of Philadelphia v. Fox, supra; Poor Directors, Melvin v. Summerville, 210 Pa. 41, 59 A. 483; Nissley v. Lancaster County, 215 Pa. 562, 64 A. 794; Commonwealth v. Sharetts, 231 Pa. 525, 80 A. 1100.

8. Article XV, section 2, provides: "No debt shall be contracted or liability incurred by any municipal commission, except in pursuance of an appropriation previously made therefor by the municipal government." This restriction is one of those designed to prevent the recurrence of the evils experienced prior to 1873, resulting from the separation of the power to contract debts from the duty of the municipality to raise funds to pay them (Perkins v. Slack, supra). As it appears, from what has already been said, that defendant Authority is not a municipal commission or a municipal government, and is not spending the funds either of the county or of the municipalities involved, nothing more need be

said. See Saltzman v. Olds, 215 Pa. 336, 64 A. 552.

9. Article IX, section 8, is next relied on. It includes the following: "The debt of any county, city, borough, township, school district, or other municipality or incorporated district, except as provided herein, and in section fifteen of this article, shall never exceed seven (7) per centum upon the assessed value of the taxable property therein,......nor shall any such municipality or district incur any new debt, or increase its indebtedness to an amount exceeding two (2) per centum upon such assessed valuation of property, without the consent of the electors thereof at a public election in such manner as shall be provided by law......" If the proposed bonded indebtedness constitutes a debt within that provision, plaintiff's bill must, of course, be sustained. In his argument at this point, plaintiff contends that the "creation of the Authority is a fiction designed to evade constitutional limitations on the indebtedness of municipalities"; that the debt of the Authority is the "debt of the taxpayers of Allegheny County"; that the bonds of the Authority should be considered as "in effect the debt of the county." It is never an illegal evasion to accomplish a desired result, lawful in itself, by discovering a legal way to do it.[3] We cannot consider the obligation as the debt of the county, unless it is a debt which the county has agreed to pay or can be required to pay. If we understand, as was said in Keller v. Scranton, supra, at 135, that the words "debt and indebtedness in the section in question are not used in any technical way, but in their broad general meaning of all contractual obligation to pay in the future for considerations received in the present," there is no foundation for plaintiff's position, because, not only has the county not promised to pay, either expressly or by implication, but the statute clearly provides the method and the only method of obtaining payment. Not only is that true, but, in

---

[3] Gaw v. R. R. Co., 196 Pa. 442, 46 A. 372; U. S. v. Isham, 17 Wall. 496.

addition, the statute denies the power to pledge the credit of the county (section 501 supra). This section of article IX, together with sections 7 and 10, already referred to, were among the provisions inserted in the constitution to prevent municipal extravagance such as had been theretofore suffered in the absence of restriction.[4] We are here dealing with the construction of a purely public self-liquidating project. The denial of power to incur liability on the credit of the county or of any municipality is notice to the prospective purchasers of the bonds that their security and their only source of payment will be in the revenues derived from users of the improved highway facilities: see Moore v. City of Nampa, 276 U. S. 536. The bondholders cannot call upon the public treasuries to contribute; no county or municipal property can be taken for the debt, because the bondholders have agreed to look to a special fund for payment to be raised in the manner provided. It will be the duty of the defendant corporation to provide adequate tolls and charges. These highways cannot be sold on execution.

The two cases relied on by plaintiff point the way against him. In Lesser v. Warren Borough, 237 Pa. 501, 85 A. 839, the borough's bonds were to be secured, not alone by the revenue from the water works proposed to be purchased, but by the water works itself; if it was mortgaged for the payment of the bonds, the obligation was a municipal debt and that borough asset was liable to be taken in payment. We adhere to what was decided in that case. In Schuldice v. Pittsburgh, 251 Pa. 28, 95 A. 938, the city, under authority to purchase a bridge, acquired it by buying all the capital stock of the corporation owning the bridge (notwithstanding article IX, section 7 of the Constitution, supra). It was held that the bonded debt secured on the bridge at the time the city purchased the stock, must

---

[4] Brooke v. Phila., supra; Keller v. Scranton, supra.

be considered a municipal debt, for, unless it was paid, the city would lose the property. But plaintiff in this case can point to no property that the county or municipalities would lose. It is true that, by the trust indenture, the trustee may enter and collect tolls, if the Authority defaults, but when the debt is paid in that way, the power of the trustee and the Authority is ended, and the property reverts to the public authorities that formerly held it for the State. This difference between a pledge of property and a pledge of income merely, has been said to distinguish a transaction which creates a debt within the constitutional limitation from one creating a debt not within it: City of Bowling Green v. Kirby, 220 Ky. 839, 295 S. W. 1004. Special funds for payment of improvements in this Commonwealth may be illustrated by the so-called improvement bonds (First Catholic Slovak Union v. Scranton, 311 Pa. 500, 167 A. 34) and by special assessments against benefited property: Harrisburg v. McPherran, 14 Pa. Superior Ct. 473, affirmed, 200 Pa. 343, 49 A. 988; Philadelphia, to use, v. Pemberton, 208 Pa. 214, 57 A. 516. Also see Dillon, Municipal Corp., sections 893 and 1438 et seq; annotation, 72 L. R. A. 687.

In re California Toll Bridge Authority, 212 Cal. 298, 298 Pac. 485, action under a statute creating a public authority to construct a toll bridge between San Francisco and Oakland was challenged, as conflicting with a constitutional provision prohibiting creation of a debt in excess of $300,000.00 without a vote of the people. The statute appears to have contained a provision substantially to the same effect as section 501 supra. In the course of his opinion sustaining the statute, WASTE, C. J., said (at page 302) : "The overwhelming weight of judicial opinion in this country is to the effect that bonds, or other forms of obligation issued by states, cities, counties, political subdivisions, or public agencies by legislative sanction and authority, if such particular bonds or obligations are secured by and payable only

from the revenues to be realized from a particular utility[5] or property, acquired with the proceeds of the bonds or obligations, do not constitute debts of the particular state, political subdivision, or public agency issuing them, within the definition of 'debts' as used in the constitutional provisions of the states having limitations as to the incurring of indebtedness. The decisions we shall presently cite clearly establish that to be so.

"While this court has had little occasion to consider the 'revenue bonds' method of financing public utilities and structures, there is some precedent in this state, and we are not without ample authority from other sections of the country, where the question has, on repeated occasions, engaged the attention of other courts of last resort, notably, New York, West Virginia, Alabama, Kentucky and Arkansas. We deem it only necessary, in support of the conclusion we have reached, to quote from the opinions of the courts in those states, and from our own decisions." See, also, California Toll Bridge Authority v. Kelly, 218 Cal. 7, 21 Pac. (2d) 425 (1933); Bates v. State Bridge Commission, 109 W. Va. 186, 153 S. E. 305; Alabama State Bridge Com. v. Smith, 217 Ala. 311, 116 S. 695; Estes v. State Highway Com., 235 Ky. 86, 29 S. W. (2d) 583.

Under this heading, plaintiff also contends that "the bonds of the Authority should be considered as in effect the debt of Allegheny County because: (1) The county owns the beneficial interest in the Authority's property and controls it through the power to appoint and remove the Authority's members; (2) county property, transferred to the Authority without present payment of its fair value, is pledged for a debt of the Authority; (3) the county has contracted to maintain the improvements."

Under the statute, as has been said, the county is not

---

[5] As was said at the outset of our discussion, we exclude from our consideration all activities within the class of proprietary business that may be conducted by municipalities.

and cannot be made liable, and this immunity is not removed by the accident that the commissioners appoint the members of the Authority, or that the county, with the rest of the public, may benefit by the improvement. The statute authorizes the county to convey such property as is necessary for the highway construction and improvements contemplated by the project, but, as the highway system belongs to the state, and was held by the counties and municipalities for the account of the state, there is no question, under the decisions cited earlier in this opinion, of the power of the state to authorize the transfer for the purpose contemplated.

The maintenance agreement (Exhibit M) contains the following provision: "AND FURTHER, the said County hereby covenants and agrees that it will, from and after the completion of any of the Public Works and Improvements constituting the System, and so long as any of the Bonds contemplated by said Loan Agreement shall be outstanding, at the County's own expense and without cost to the Authority, provide for and pay all costs of operation, repair and maintenance of said System (including the Fort Duquesne Tunnel and the Liberty Tunnel) other than the cost of supervision and collection of tolls and the overhead costs of the Authority, but including specifically but without limitation in the costs which the County agrees to and will provide for and pay, the cost of all insurance, whether maintained by the Authority or by the County, all lighting, sweeping, cleaning, and removing snow from structures and approaches, of each and every part of said System (including the Fort Duquesne Tunnel and the Liberty Tunnel), and the cost of policing the same not otherwise provided for and paid by the City of Pittsburgh, the City of McKeesport and/or the other municipalities, parties in interest." An objection on similar grounds was made and rejected in California Toll Bridge Authority v. Kelly, 218 Cal. 7, 21 Pac. (2d) 425. It is said in the brief that the parties agree "that the cost to the

County of performing such Agreement will be well within its annual current revenues"; on that understanding we sustain the agreement; the costs of operation, repairs and maintenance described above can never exceed the annual current revenues applicable thereto. The state may require local subdivisions of its government to maintain highways. The power to appropriate money to the police pension fund association was sustained in Com. ex rel. v. Walton, supra; to the abolition of railroad and highway grade crossings: Brooke v. Phila., supra; Chew v. Phila. et al., 257 Pa. 589, 101 A. 915; to a Firemen's Relief Association: Com. v. Barker, 211 Pa. 610, 61 A. 253; to the Sesqui-Centennial Association in Sambor v. Hadley, supra; to the purchase of land, part of which was in an adjoining county for an airport in Wentz v. Philadelphia, supra; a school district was permitted to insure its school buildings with a mutual fire insurance company: Downing v. Erie School District, supra. See, also, Shirk v. Lancaster City, supra, at page 164, and the Act of July 9, 1919, P. L. 814, providing for the construction of the Delaware River bridge. If these annual expenditures are made out of current revenues, the obligation to make them is not a debt within the constitutional sense: see Appeal of City of Erie, 91 Pa. 398; Old Forge Borough cases, 309 Pa. 73 et seq., 163 A. 154 et seq.; Ohlinger v. Maidencreek Township, 312 Pa. 289, 167 A. 882.

10. The last objection is twofold: that certain provisions in the proposed Loan Agreement conflict (a) with section 402 of the statute, and (b) with article III, section 7, of the Constitution.

(a) Section 402 provides "All contracts shall be let and purchases made by the 'Authority' in the manner now provided by law relating to contracts and purchases by county commissioners in counties of the second class."

Plaintiff contends that, as the General County Law, 1929 P. L. 1278, article IX, section 704, 16 PS 704, provides that contracts and purchases must be let "to the

lowest responsible bidder," and, as the loan agreement imposes other provisions, the contract is illegal. But section 402 cannot be read alone. It must be considered with other related parts of the statute (Lindenmuth v. Com. 312 Pa. 350, 354, 167 A. 787, 789), and, when so construed, leaves no support for plaintiff's position. The title gives notice that the Authority is to be empowered to make "agreements with the Government of the United States, particularly as they relate to the National Industrial Recovery Act......" Section 1 (a) confers power to construct certain improvements, and to charge for their use and apply the revenues "for the purpose of maintaining and operating the same and of repaying to the United States Government, and to others, any and all monies, and interest thereon......" In section 1 (i), power is conferred "specifically, to borrow from the Government of the United States......for the construction, maintenance and operation of the projects. ......" Section 1 (s) provides for the winding up when the debts, including those to the United States, shall have been paid. Further, as defendant points out, section 502 "provides for annual audits of the affairs of the Authority, copies of which are to be given, inter alia, to Federal Emergency Administration of Public Works, an agency which is created and exists only by virtue of section 201 of Title II of the National Industrial Recovery Act."

The National Industrial Recovery Act, approved June 16, 1933, 48 Stat. 195, provides in section 206: "(a) All contracts let for construction projects and all loans and grants pursuant to this title shall contain such provisions as are necessary to insure (1) that no convict labor shall be employed on any such project; (2) that (except in executive, administrative, and supervisory positions), so far as practicable and feasible, no individual directly employed on any such project shall be permitted to work more than thirty hours in any one week; (3) that all employees shall be paid just

and reasonable wages which shall be compensation sufficient to provide, for the hours of labor as limited, a standard of living in decency and comfort; (4) that in the employment of labor in connection with any such project, preference shall be given, where they are qualified, to ex-service men with dependents, and then in the following order: (A) To citizens of the United States and aliens who have declared their intention of becoming citizens, who are bona fide residents of the political subdivision and/or county in which the work is to be performed, and (B) to citizens of the United States and aliens who have declared their intention of becoming citizens, who are bona fide residents of the State, Territory, of District in which the work is to be performed: *Provided,* That these preferences shall apply only where such labor is available and qualified to perform the work to which the employment relates; and (5) that the maximum of human labor shall be used in lieu of machinery wherever practicable and consistent with sound economy and public advantage."

Pursuant to power conferred on the President by the same act, the public works administrator promulgated rules and regulations[6] with which (as we understand the parties to agree) the provisions in the loan agreement comply. The General Assembly is presumed to have been familiar with this federal legislation, and the regulations made pursuant to it, when enacting the statute containing important legislative references to it. It must, therefore, have been intended that, where funds are obtained from the Government of the United States, the competitive bidding provisions of the County Law referred to shall apply, subject to the further qualification that all bids, to be considered, must comply with the provisions of the National Industrial Recovery Act. In such cases, bidders not complying with the pro-

---

[6] (Given in the brief as, P. W. A. Bulletin No. 2, I-C, C. H. Federal Trade Regulation Service, pw. 2181.)

visions regarding labor, etc., must be deemed not to be "responsible" within this act.

(b) There is no basis for plaintiff's complaint that the loan agreement is repugnant to "that part of Article III, section 7, of the Constitution which prohibits special legislation regulating labor, trade, mining or manufacturing." The agreement is not legislation.

Consideration of the constitutional objections urged against the statute has necessarily been confined to the effect of the proposed action as related to the contemplated highway improvement which constitutes the project disclosed by this record.

The bill is dismissed at plaintiff's costs.

DISSENTING OPINION BY MR. JUSTICE SIMPSON and MR. JUSTICE SCHAFFER:

We dissent from the decree in this case, but in so doing must not be supposed to complain of the opinion of the majority. So far as it goes, the latter leaves little to be desired, but, in our judgment, it does not go far enough. Its error, as we view the matter, consists in reviewing only the particular matters argued orally and in the briefs.

Article III, section 3, of the state Constitution provides that "No bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title." The purpose of this provision has been many times stated by us. Beginning at least as far back as Dorsey's Appeal, 72 Pa. 192, 195, we said: "The title should be so certain as not to mislead. The language of the amendment is 'one subject which shall be clearly expressed in the title.' 'To be clearly expressed' certainly does not mean anything which is dubious, and therefore is not clearly expressed." This was quoted with approval in Provident L. & T. Co. v. Hammond, 230 Pa. 412. Every one at all versed in the constitutional history of Pennsylvania knows that prior to the Amendment of 1864, now restated in the

above quoted provision from the Constitution of 1874, it was usual to name some one purpose in the title to a bill, and add thereto "and for other purposes," and then enact any and everything desired, whether or not relevant to the expressed purpose. This is noted in White on The Constitution of Pennsylvania, page 213, as one of the reasons for the constitutional provision.

Turning now to the Act of December 27, 1933, under consideration, the title also has at the end thereof the words "and for other purposes." For the reason already given those words must be considered as adding nothing to the scope of the statute. So far as we are aware, however, purely superfluous words in the title to a statute, have never been held to destroy the act; hence we do not think they should be given that effect here.

There is, however, an earlier provision of the title which is repugnant to article III, section 3, of the Constitution, and, this being vital, the statute should fall. The title states that it is "An Act providing for the creation of public 'Authorities' in counties of the second class" etc., etc. Nowhere does it appear in the title what "public authorities" are, and those words, as attempted to be explained by defendants, are and always have been alien to our government, laws and customs. Do they denote a new class of officials for "counties of the second class"? Are they to supersede in whole or in part some of the existing county officials, and, if so, which of them? Or are they to be given new powers and duties in counties of the second class, entirely separate and distinct from those now vested in any county official? These and numerous other cognate questions at once arise when the title alone is considered as, in the light of the constitutional provision under consideration, it must be. It was suggested that this objection is unavailing because in other states there were "public authorities" like that referred to in this act, before our statute was passed, but this does not help. What they were or are does not appear at all in the title to

this statute, and nothing appertaining thereto is "clearly expressed" therein. So far as we have been able to discover there is no uniformity in the character of the "public authorities" elsewhere, save in the fact that they are substitutes for other public officials in the performance of some public duties. If the title had been "An Act providing for the creation of public [corporations under the title of] Authorities in counties of the first class" etc., etc., this, with the balance of the title, would possibly have sufficed as respects that which was actually enacted; but the title, as it is, does not "clearly express" the one subject of the act, and hence is fatally bad.

The next clause in the title is also anything but "clear." It is: "authorizing such 'Authorities' to enter into agreements with the Government of the United States, particularly as they [the Agreements?] relate to the National Industrial Recovery Act and any amendments and supplements thereto, the Commonwealth of Pennsylvania and political subdivisions and municipalities thereof, and with others." What class of "others"? Public or private? Noscitur a sociis? The title furnishes no answer.

There is one other matter, which seems to us of great import and hence should be specially referred to. Attached to the bill as an exhibit, signed by the county commissioners and the Allegheny County Authority, is an agreement by which the county agrees at its "own expense and without cost to the Authority, to provide for and pay all costs of operation, repair and maintenance of said System [including the Fort Duquesne Tunnel and the Liberty Tunnel] other than the cost of supervision and collection of tolls and the overhead costs of the Authority, but including specifically, but without limitation in the costs which the County agrees to and will provide for and pay, the cost of all Insurance, whether maintained by the Authority or by the County, all lighting, sweeping, cleaning and removing snow from

structures and approaches, of each and every part of said System [including the Fort Duquesne Tunnel and the Liberty Tunnel], and the cost of policing the same not otherwise provided for and paid by the City of Pittsburgh, the City of McKeesport, and/or the other municipalities, parties in interest." To plaintiff's complaint that this may result in increasing the debt of the county beyond the constitutional limitations, the majority answer that "It is said in the briefs that the parties agree 'that the cost to the county of performing such Agreement will be well within its annual current revenues. On that understanding we sustain the agreement; the costs of operation, repairs and maintenance above described never can exceed the annual current income applicable thereto...... If these annual expenditures are made out of current revenues, the obligation to make them is not a debt within the constitutional sense." It is conceded, of course, that if in any year the expense referred to, together with all other expenses properly chargeable against current revenues, do not exceed the total thereof, both may be paid therefrom and the debt will not be increased. The agreement itself does not refer to the current revenues, however, but is an out and out promise to pay under any and all circumstances. It may be that ordinarily the expenses on this account would not exceed the surplus of the current revenues, but it is equally possible that at some time they would be too great, as for instance in case a bridge, after complete construction, but before being turned over to the county, should be wholly destroyed from any cause. What then? Under this contract, if sustained by the courts, the county would have to borrow money to pay for the reconstruction, and then the question of the constitutional limitation of debt would at once arise.

There is another difficulty. The Act of December 27, 1933, under consideration, does not provide that the county shall contract to pay or shall pay such maintenance and expenses,—indeed does not refer to the matter

at all; and we have been referred to no other statute placing such a liability on the county. So far as appears the agreement was prepared by the federal emergency administration of public works, which is not referred to in the Act of 1933, or given any authority to place such an expenditure on the county.

If there can be found somewhere an authority for the county commissioners to make such a contract, then, of course, that authority will necessarily be limited by the constitutional provision regarding the maximum amount of the county's debt, and the question of constitutionality at once becomes important. To us it is clear that in so far as compliance with the contract does or may violate the constitutional inhibition the contract must fall. Where it does not appear in figures what a public corporation's possible liability may be in a project which it seeks to enter into, but where, by the terms of its undertaking, its debt may be increased beyond the constitutional limit, the possibility of such an increase must be taken into account by the court in determining whether thereby the constitution may be violated, and where, as here, the ultimate expenditures of the county, under the contract, may exceed the debt limit, it is our duty to halt the project so that possible constitutional infringement may not take place.

If it be thought that we should not do this in the present case, because this objection is not specifically referred to in the bill, and relief there against it is not specifically prayed for, then, in fairness to all those who are or may be interested, they should be advised that this is at least an open matter, both as to the right to make such a contract, and as to possibility of the constitutional inhibition being applied. Since the Act of 1933 does not provide that the county should make such payments out of the current revenues or otherwise, the maintenance agreement providing therefor would seem to be an afterthought without any legislative action to support it and hence illegal.